### STATE *v.* DOMINICO COSTA.

October Term, 1905.

Present: ROWELL, C. J., TYLER, WATSON, HASELTON, and POWERS, JJ.

Opinion filed November 20, 1905.

*Criminal Law—Evidence—Return on Search Warrant—Witnesses—Refreshing Memory—Cross-Examination—Intoxicating Liquors—Criminal, Prosecution—Malt Extract—Medicinal Use—Use of Other Preparations—Use as a Beverage—Other Offences—Instructions—Reasonable Doubt—New Trial—Treating Jury—V. S. 1232.*

In a prosecution for keeping intoxicating liquors with intent to sell the same without authority, the return on a search warrant, by virtue of which respondent's premises were searched, is not admissible against him.

In a prosecution for keeping intoxicating liquors with intent to sell the same without authority, an officer, in testifying, may refresh his memory by his return on a search warrant by virtue of which he searched respondent's premises.

The doctrine of the presumption of innocence is something distinct from the doctrine of reasonable doubt.

In a prosecution for keeping intoxicating liquors with intent to sell the same without authority, it was proper to allow the officer

who searched respondent's premises to testify that he made the search by virtue of a warrant to search 'for intoxicating liquor; the court having charged fully and correctly in respect of reasonable doubt and the presumption of innocence.

Where, in a prosecution for keeping intoxicating liquor with intent to sell the same without authority, a physician testified that the malt extract found in respondent's place of business was sold, used to a great extent, and prescribed by physicians, as a proprietary medicine, and the court charged that there was no doubt that said malt extract was a legitimate medicine frequently prescribed by physicians, and that such a preparation might be manufactured for a lawful purpose and lawfully sold as a medicine, the tendency of respondent's evidence as to the medicinal character of the medicine was sufficiently presented to the jury.

Where, in a prosecution for keeping intoxicating liquor with intent to sell the same without authority, the evidence tended to show that the malt extract found in respondent's place of business contained about four per cent. of alcohol and that respondent kept it for sale, and there was no claim or evidence to the contrary, it was not error to refuse to permit the manufacturer of said malt extract to testify as to the percentage of alcohol in the other medicines manufactured by his firm.

It was proper to exclude testimony of grocers and druggists that they had for a long time sold the malt extract in question openly and visibly.

It was proper to exclude evidence that the malt extract in question was used by the medical profession and by people generally for the same purposes as certain other proprietary medicines, and that a person could not become intoxicated by the use of such other medicines.

It was proper to permit the amount of alcohol and of the other ingredients in the malt extract found in respondent's place of business to be shown; for the character of a liquid containing more than one per cent. of alcohol may be such that its use as a beverage is impossible.

Where, in a prosecution for keeping intoxicating liquor with intent to sell the same without authority, the State relies upon extracts, tinctures, essences, or compounds having a legitimate use for medicines, culinary, or toilet purposes, the question is not simply whether these articles contain more than one per cent. of alcohol, but there is the further question whether they were sold to be used as a beverage.

In respect of the sale of such articles, the intent governs. If there is no intent to sell these preparations to be used as a beverage, there is no offence.

In a prosecution for keeping intoxicating liquor with intent to sell the same without authority, testimony of a witness that he bought four bottles of the malt extract found in respondent's place of business, and that respondent told the witness that he could not drink it in the store but must go outside to do so, is admissible as tending to show respondent's intent.

Evidence tending to show that the respondent sold a malt extract for use as a beverage in March, 1905, tends to show that in June of that year he was keeping to sell as a beverage certain bottles of said extract which he was then exposing for sale.

It was proper to allow a witness to testify that, when he purchased a bottle of the malt extract found in respondent's place of business, he asked respondent to open the bottle for him, but that respondent refused to do so, saying that witness must take it away.

Where, in a prosecution for keeping intoxicating liquor for sale without authority, the State relied upon evidence tending to show that respondent sold the malt extract found in his place of business to specified persons for use as a beverage, it was not error to refuse to allow respondent to show that he sold this extract to still another person for medicinal use in his family.

An instruction that, if the malt extract kept by respondent was bought and used as a beverage because of the intoxicating ingredient contained therein, it was a beverage and an intoxicating one within the statute, was not erroneous, when accompanied by a correct instruction as to the amount of alcohol which the preparation must have contained to be deemed intoxicating liquor, and by the further instruction that, since it had a legitimate medicinal use, its use as a beverage would not make respondent liable, unless he kept it to sell as a beverage.

In a prosecution for keeping intoxicating liquor with intent to sell the same without authority, the State relied upon certain malt extract kept and sold by respondent, and which had a legitimate medicinal use, the court charged: "We do not submit the question—we do not make your verdict depend in any way upon the question—whether it is possible for the ordinary man, or any man, to drink enough of this preparation to intoxicate him." This instruction was accompanied by a correct instruction as to the amount of alcohol which the preparation must have contained to be deemed an intoxicating liquor, and by the instruction that, in

determining whether the preparation was sold for use as a beverage, all the evidence in the case bearing upon the composition of the liquid, the medicinal properties of the ingredients, the percentage of alcohol, its effect or lack of effect in the quantities testified to, and its pleasantness or unpleasantness to the taste, should be considered. *Held*, that the instruction quoted was not erroneous.

In charging the jury in a criminal case, it is not error for the court to refuse to define the phrase "reasonable doubt."

V. S. 1232, which provides that if a party in whose favor a verdict is rendered during the same term of court gives to a juror in the case any victuals or drink by way of treat, it shall be ground for a new trial, has no application to a criminal case.

Although V. S. 1232 has no application in criminal cases, a respondent should be granted a new trial where there is sufficient reason to believe that a verdict has been returned against him in consequence of corruption practiced upon the jurymen by an officer or by anyone else.

No officer of the State can make himself an agent of the State in respect of practices forbidden by the State.

Where, in a criminal prosecution, after the case had been submitted to the jury and they had retired to consider it, they told the sheriff that they should want supper, which the sheriff thereupon ordered, but before going to supper the jury returned their verdict, and were then permitted to eat the supper procured at the expense of the State, there was nothing in the nature of corruption or impropriety..

INFORMATION for keeping intoxicating liquor with intent to sell the same without authority. Plea, not guilty. Trial by jury at the June Term, 1905, Caledonia County, *Munson*, J., presiding. Verdict, guilty; judgment and sentence thereon. The respondent excepted.

Respondent's defence was that he did not keep the malt extract for sale as a beverage, but kept it for sale, and sold it, only as a medicine.

*Harland B. Howe* for the respondent.

Our liquor law does not apply to the sale of medicinal preparations. *Russell* v. *Sloane,* 33 Vt. 656; *Fober* v. *Green,* 72 Vt. 117; *State* v. *Kezer,* 74 Vt. 50; *Carl* v. *State,* 87 Ala. 17.

*Frank D. Thompson,* State's Attorney,⸱ and *David E. Porter* for the State.

The fact that witnesses in March had bought malt extract · from respondent for use as a beverage, is evidence tending to show that respondent kept the extract in question in the following June for sale as a beverage. *State* v. *White,* 70 Vt. 225; *State* v. *Haley,* 52 Vt. 476; *Com.* v. *Cotton,* 138 Mass. 500.

Evidence that respondent sold the malt extract to one man for use as a medicine does not tend to show that he did not also keep it for sale as a beverage. *Com.* v. *Roland,* 97 Mass. 597; *Aikin* v. *Kennison,* 58 Vt. 665; *Harris* v. *Howard,* 56 Vt. 695; *Com.* v. *Jeffries,* 7 Allen 548, 83 Am. Dec. 712.

Under our statute the sale of any beverage which contains more than one per cent. of alcohol is prohibited, irrespective of whether it is intoxicating. *Com.* v. *Snow,* 133 Mass. 575; *Com.* v. *Curran,* 119 Mass. 206; *Com.* v. *Timothy,* 8 Gray 480; *State* v. *McKenna,* 16 R. I. 398.

HASELTON, J. This was an information for keeping intoxicating liquor with intent to sell the same without authority. The evidence on the part of the State tended to show that the respondent kept a fruit and cigar store "and sold soda and soft drinks," and that June 24, 1905, one A. H. Noyes searched said store and found in the cellar a large quantity of "Red Cross Canada Malt Extract" put up in pint bottles, and that he found three bottles of the same on a shelf in the store, and one bottle in the show window. The time of this search is the time of the alleged offence. Noyes testified, under

objection and exception, that he made the search referred to and found the malt extract while acting under a warrant to search the respondent's store for intoxicating liquor. The objection was that the search warrant and the return thereon were the best evidence. As to the return it is enough to say that in this proceeding it was not admissible against the respondent. Noyes might have used it to refresh his recollection and the respondent might have cross-examined from it, and if it was inconsistent with the testimony of Noyes the respondent might have made another use of it, but the man who made the search was properly called to testify to the finding of the malt extract and the circumstances in which it was found. One of these circumstances, the finding of a bottle of the extract in the show window, was favorable to the respondent.

But it is urged that the witness should not have been allowed to testify that he made the search by virtue of a warrant to search for intoxicating liquor; that the warrant should have been produced. However, the character and sufficiency of the warrant were not in issue. The witness was merely explaining how he came to be hunting over the respondent's cellar and other premises. It is often impracticable for a witness to testify as to his doings without referring in a general way and by its proper designation to some writ, warrant, execution, chattel mortgage, book or other document; and there is no rule of law which, properly interpreted, makes it error for a witness to do so without producing the document when the contents of the document are not the subject of inquiry and are not material to any question raised. The respondent concedes that the witness might well enough have said that he was at the respondent's store by virtue of a warrant, but urges that the witness prejudiced the respondent by saying that he was acting under a warrant to search for in-

toxicating liquor.   But if the witness had simply testified that he had a warrant, the respondent might have argued that the jury were left to infer that there was a warrant out for the arrest of the respondent or for the search of his store for some purpose not connected with the very charge for which he was on trial.   If the witness had left his testimony in the way in which it is said by respondent's counsel that he should have left it, the respondent might have argued that he was prejudiced in respect to his general character.

It is undoubtedly true that there is danger of prejudice against a respondent because he stands in court under arrest charged with a criminal offence, since it is well understood that under our system he could not be in that situation unless there was some evidence or supposed evidence against him. It is for this reason, more than any other, that the doctrine of the presumption of innocence is maintained in this jurisdiction as something distinct from the doctrine of reasonable doubt.   And so in this case the court not only charged fully and correctly with regard to reasonable doubt and the presumption of innocence, but also particularly charged the jury that the facts that the charge for which the respondent was on trial had been brought against him and that he was on trial therefor were not to be taken against him.

The evidence tended to show that the extract, to the finding of which the testimony of Noyes related, contained about four per cent. of alcohol and that the respondent kept it for sale, and there was no claim or evidence to the contrary.   But the main question in the case was whether the respondent kept this malt extract to sell for medicinal uses only, or whether he kept it to sell for use as a beverage.   Several exceptions relate to the claim that the respondent was unduly restricted in proving that the malt extract was a legitimate proprietary medicine which might properly be sold for medicinal uses; and

that the tendency of the evidence in that regard was not sat-
isfactorily presented to the jury; but the case shows otherwise.
The respondent himself testified that he was a wholesale and
retail dealer in patent medicines, that this extract was such a
medicine, that he did not keep it for sale as a beverage.   Dr.
E. W. Hitchcock of St. Johnsbury gave evidence tending to
show that the malt extract "was sold and used as a proprietary
medicine to a great extent, that it was generally prescribed by
physicians, that it was used to a large extent as a medicinal
tonic." The facts which this evidence of Dr. Hitchcock
tended to show were treated as established, for the court
charged the jury, in substance, that there was no question in
the case but that the malt extract is a legitimate medicine
frequently prescribed by physicians and extensively sold in the
drug trade.

The court charged further that "a preparation of this kind
may be manufactured for a lawful purpose and be kept and
sold as a medicine without violation of law." Indeed, there
is considerable more in the charge to the same effect.

The respondent called as a witness one Harris, a member
of the firm which manufactures the Red Cross Canada Malt
Extract, and he testified to the effect that his firm manufac-
tures various other proprietary medicines, among them Har-
risonia, sarsaparilla, and a preparation of beef, iron and wine.
In the course of the testimony of this witness the respondent
offered to show "the percentage of alcohol in the other pro-
prietary medicines which his firm manufactured and sold for
the same purpose as said extract, and particularly that beef,
iron and wine contained 50 per cent. of alcohol, for the pur-
pose of comparing this extract, which was one of said pro-
prietary medicines, with said other proprietary medicines, and
as tending to classify and characterize it as a patent or pro-
prietary medicine." The offered evidence was excluded.   By

the same witness the respondent offered to show that two grocers and three druggists in St. Johnsbury had for a long time sold this malt extract openly and visibly "as tending to characterize the article as a patent or proprietary medicine and to show its general use as such." Evidence under this offer was excluded. The respondent also offered to show by the same witness that this malt extract "was compounded and put upon the market to be used and administered for the same purposes and for the same general use as said other proprietary medicines which his firm manufactured." The offered evidence was excluded.

These rulings of the court excluding offered evidence from the witness Harris were not erroneous. Evidence as to beef, iron and wine, Harrisonia, and the other proprietary medicines manufactured and sold by the firm which manufactured the malt extract, and of the doings of a few dealers in St. Johnsbury would have been wholly immaterial, though it might have been misleading.

After Dr. Hitchcock had given the evidence above referred to tending to establish the character of the malt extract as a legitimate medicine, prescribed as such by physicians, and lawfully sold and used for medicinal purposes, the respondent offered to show by the doctor: (1) "that this malt extract was used by the medical profession and by people generally for the same purposes as sarsaparilla, Paine's Celery Compound, Peruna, and beef, iron and wine; (2) that Peruna contained from 50 to 61 per cent. of alcohol, beef, iron and wine from 25 to 30 per cent. of alcohol; (3) that a person could not become intoxicated upon Peruna, beef, iron and wine, or this extract." Each of these three offers was made and excluded separately, but all were made "as tending to compare this extract with other patent or proprietary medicines as to its composition, general use, effect upon the system, and to classify and show

its use as a patent or proprietary medicine." But these comparisons would have been irrelevant and would have had a tendency to get before the jury evidence with regard to various preparations, more or less popular as remedies, in a way that would have had a tendency to lead the jury to decide the case upon erroneous grounds.

The court, however, permitted the actual amount of alcohol and of the other ingredients of the extract to be shown, and properly did so, for the character of a liquid containing more than one per cent. of alcohol may be such that its use as a beverage is impossible, as is the case with some virulent poisons. The mere fact that a liquid can be and is swallowed does not make it a beverage. *Tabor* v. *Green,* 72 Vt. 117, 47 Atl. 391.

So it must be said in the case of extracts, tinctures, essences and compounds having a legitimate use for medicinal, culinary or toilet purposes, that the mere presence as a solvent, preservative, or otherwise, of more than the proportion of alcohol named in the statute does not make the preparation one to which the statute applies.

In respect to such articles the inquiry is not simply whether they contain more than one per cent. of alcohol, but there is the further inquiry whether or not the articles are sold to be used as a beverage. In respect to the sale of such preparations the intent governs. If there is no intent to sell these preparations for other than legitimate uses there is no offence. If, however, a preparation is capable of being used as a beverage, and is sold or kept for sale with the purpose, intent or understanding that it is to be used as a beverage, then, if it contains more than one per cent. of alcohol, an offence is committed.

In this trial the State proceeded in accordance with the views just stated and introduced evidence tending to show that

the malt extract in question was kept for the purpose and with the intent of selling it, or some part of it, for use as a beverage. The State introduced evidence tending to show that in June, 1904, one Petty bought this malt extract of the respondent, that in March, 1905, one Woodward bought four bottles, one Bennett two bottles, and one Besant two bottles; and that on these occasions of purchase and sale the respondent told the purchasers that they could not drink the extract on the premises. Woodward testified that he bought his four bottles for drinking purposes but that he did not inform the respondent of that fact. But the evidence tended to show that the respondent told Woodward that he could not drink it in the store, that he must go outside to drink it. To the reception of this evidence the respondent objected and excepted, but the evidence was clearly admissible. The intent of the respondent in making the sales to Woodward which the evidence tended to show, was indicated by the evidence tending to show what the respondent told Woodward about going outside to drink his purchase. It tended strongly to show that the respondent understood that Woodward was buying the extract for bibulous rather than for medicinal purposes, and it is immaterial whether he got that understanding from what Woodward said or in some other way. The evidence tended to show that in some way the respondent was aware of the use to which the customer intended to put the malt extract, and that the respondent was also aware that it could be put to such use. The evidence tending to show that the respondent sold this malt extract to Woodward for use as a beverage in March, 1905, tended to show that he was keeping the extract in question for sale as a beverage, June 24, 1905. *State* v. *White,* 70 Vt. 225, 39 Atl. 1085; *Com.* v. *Cotton,* 138 Mass. 500.

Petty's testimony tended to show that he bought the extract of the respondent in June, 1904, and that on one occa-

sion he asked the respondent to open a bottle for him, but
that the respondent said "no," and told him he would have
to take it away. The testimony of Petty was taken under
objection and exception; but it was properly received. It
bore, though more remotely than Woodward's, upon the ques-
tion of the respondent's intent in keeping the malt extract
which he had on hand, as the evidence tended to show, June
24, 1905. The statute in force at the time to which the testi-
mony of Petty related was, indeed, different from that under
which the respondent was prosecuted. But the statute of 1902
and that of 1904 were the same in all respects that could affect
the intent with which the respondent was keeping and dealing
in this extract.

The respondent offered to show that he sold this extract
to one Randall for medicinal use in his family. The offer
was made on the ground that the offered testimony would
tend to characterize the keeping of the extract by the respond-
ent, to show his intent and good faith, and to rebut the evi-
dence tending to show that he had sold the extract to Wood-
ward, Bennett, Petty, and Besant for use as a beverage. But
proof that he sold the extract to Randall for a legitimate use
was not admissible on any of the grounds stated nor on any
conceivable ground. The fact that the respondent embraced
an opportunity to make a legitimate sale of the article would
have no bearing upon the issue. The State was not called
upon to show that the respondent would refuse to make any
but illegal sales, and it would not have aided the respondent if
he had shown that he had no scruples against taking the profit
of a legal sale.

The respondent took 27 exceptions to the charge of the
court. Counsel for the respondent says nothing in his brief
about 21 of these, many of which were to very obvious prin-
ciples of law. We have, however, examined them all and the

14

parts of the charge to which they relate, for the whole law of the case could not be stated in one sentence, and propositions which seem doubtful standing alone are seen to be sound when taken in their connection. We find no error in the charge.

The sentence of the charge about which the respondent chiefly complains is this: "If this preparation was bought and used as a beverage because of the intoxicating ingredient contained in it, it was a beverage and an intoxicating beverage within the meaning of the law." But this statement was accompanied by a correct instruction as to the amount of alcohol that the extract must contain in order that in any view of the case it could be deemed intoxicating liquor, and by further instructions to the effect that since it had a legitimate use as a medicine, its use as a beverage would not make the respondent liable unless he kept it to sell for use as a beverage.

Another sentence of the charge which the respondent complains of was this: "We do not submit the question, we do not make your verdict depend in any way upon the question whether it is possible for the ordinary man or any man to drink enough of this preparation to make him actually intoxicated." But this sentence immediately follows a statement to the effect that the statute has fixed the amount of alcohol that it is essential for a preparation to contain in order that it may be deemed an intoxicating liquor within the meaning of the law, and the sentence of the charge complained of was entirely correct in its application to the element of the case which the court was then presenting.

But this was not all of the case, and so with careful regard to the rights of this respondent and of others dealing in preparations containing alcohol, the court charged the jury that, in determining whether or not this preparation, such as it was, was kept to be sold for use as a beverage, "all the evidence in the case bearing upon the composition of the liquid

and the medicinal properties of the various ingredients, the percentage of alcohol contained in it, its effect or lack of effect in the quantities testified to, whether it is pleasant or unpleasant to the taste, and what is shown regarding its use as a medicine" was for the consideration of the jury. *Russell* v. *Sloane,* 33 Vt. 656; *Fober* v. *Green,* 72 Vt. 117, 47 Atl. 391, and *State* v. *Kezer,* 74 Vt. 50, 52 Atl. 116, all cited by the respondent, were obviously and rightly treated as sound law and as still applicable to the extent to which the Kezer case is held to be applicable in *State* v. *Krinski,* 78 Vt. 162, 62 Atl. 37; that is, the principles laid down in those cases were given such effect as could be given them under a statute which treats a beverage as intoxicating liquor if it contains more than one per cent. of alcohol.

The respondent excepted lastly "because the court did not tell the jury that the respondent would have a right to sell medicine, if he sold it as a medicine and not as a beverage, even though it contained more than one per cent. of alcohol. That the jury should be charged as last aforesaid because twelve laymen would not be liable to understand the charge as given upon that matter." This exception concedes the correctness of the charge in that regard, and there was nothing in the subject-matter or the presentation of it that could possibly have been misunderstood by the jurymen.

The respondent made 14 requests to charge. Some of them were complied with in terms and some in substance, and others were not complied with. Two requests were for a definition of the phrase "reasonable doubt." Neither of the definitions asked for would have aided the jury and the court properly omitted to give these definitions. *State* v. *Blay,* 77 Vt. 56, 58 Atl. 794. The court refused to comply with no request which the respondent was entitled to have followed.

The respondent made a motion to have the verdict set aside and a new trial granted. Under this motion the court found that at about a quarter past five in the afternoon of the day on which the jury took the case and during their deliberations they told the sheriff having them in charge that they should want supper and that the officer immediately ordered their supper. However, at about a quarter before six and before going to supper they returned their verdict into court. The sheriff then told them that as he had ordered their supper they could eat it, and accordingly they partook of the supper which had been provided for them. The expense was borne by the State. It was on the ground that this supper was given the jurors by the State as a treat that the respondent moved to have the verdict against him set aside and a new trial granted. The court overruled the motion as a matter of law and the respondent excepted. The respondent now argues that the motion should have prevailed, and relies upon V. S. 1232, which provides that "if a party in whose favor a verdict is rendered, during the same term of court gives to a juror in the cause, knowing him to be such, any victuals or drink or procures it to be done by way of treat, either before or after such verdict, the same on proof thereof shall be set aside and a new trial granted."

But this statute cannot apply, and was not intended to apply to criminal cases. See *Baker* v. *Jacobs*, 64 Vt. 197, 23 Atl. 588. It cannot apply in a case in which the respondent is acquitted, and it cannot apply in a case in which the respondent is convicted, for no officer of the State can make himself an agent of the State in respect to practices forbidden by the State; nor would the fact that the expense attending an illegal act was in some way put upon the State make the government itself a party to the illegal transaction. What is intimated in *Carlisle* v. *Sheldon*, 38 Vt. 440, in respect to treating by an

authorized agent of a town in a civil suit, has no application here. But while the statute relied upon by the respondent has no application in criminal cases, a respondent should be awarded a new trial when there is sufficient reason to believe that a verdict has been returned against him in consequence of corruption practiced upon the jurymen by an officer of the State or by any one else. But here the facts found have no tendency to show corruption, or an attempt at corruption. No. 135, Acts of 1898, provides that, "when in the trial of a criminal cause in county court a petit jury is kept together by the order of the court, the necessary expenses of the board and lodging of such jury while so kept together shall be borne by the State." This supper was ordered and provided for the jurors, and so the expense of it was incurred, while the jurors were kept together, and there was nothing in the nature of corruption or impropriety in the conduct of the sheriff in letting the jurymen eat the supper which he had provided in pursuance of his duty under the statute.

The motion to have the verdict set aside and a new trial granted was properly overruled as a matter of law.

*Judgment that there is no error in the proceedings, and that the respondent take nothing by his exceptions. Let execution be done.*