262.  MASON *v.* THE STATE.

1. The act of 1877, making unlawful the sale of intoxicating liquors within three miles of the Masonic Academy in the town of Swainsboro, was not repealed by section 26 of the charter of the City of Swainsboro, approved December 6, 1900.

2. The words, "in Swainsboro, Georgia," used in a criminal accusation, are apt words to convey the meaning that the acts alleged occurred within the territorial limits of the municipal corporation bearing that name.

3. The mere fact that the school formerly taught in the Masonic Academy, which was designated as the center of a three-mile area in which a local prohibition act became effective, is no longer taught in the original building, but in a new house a short distance away, does not invalidate the conviction, under that act, of one who is guilty of selling intoxicating liquor within three miles of both the original and the subsequent location of the school.

4. Oral testimony tending to prove that a given act occurred within three miles of a certain Masonic Academy is not subject to the objection that the charter of the academy is the highest evidence.

5. The expression "intoxicating liquors," as used in statutes, in the absence of other words, tending to limit the meaning, may be defined as including any liquid intended for use as a beverage or capable of being so used, containing alcohol, obtained either by fermentation or distillation, or both, in such a proportion that it will produce intoxication when taken in such quantities as may practically be drunk.

(*a*) Medicinal, toilet, and culinary preparations, recognized as such by standard authority (such as the United States Dispensatory) and not reasonably capable of use as intoxicating beverages,—e. g. tincture of

gentian, paregoric, bay rum, cologne, essence of lemon, wood alcohol,—, are not ordinarily to be regarded as being within the meaning of the expression "intoxicating liquors," though such articles are liquid, contain alcohol, and may produce intoxication.

(b) Patent medicines, cordials, bitters, tonics, and other articles not recognized by standard authority as being within the class just mentioned, are to be regarded as being intoxicating liquors, if they are capable of being used as a beverage and contain such a percentage of alcohol as that, if drunk to excess, they will produce intoxication.

6. While the evidence was amply sufficient to support the verdict, yet, since the defendant made the specific contention that the particular patent medicine which he was accused of selling was not capable of being used as a beverage, and introduced proof tending to show this fact, and the trial judge, in his instructions to the jury, entirely ignored this defense, the exception upon this ground must be sustained.

Accusation of unlawful sale of liquor, from city court of Swainsboro—Judge Mitchell. February 11, 1907.

Argued March 21,—Decided March 28, 1907.

*Saffold & Larsen,* for plaintiff in error.

*Henry R. Daniel, solicitor,* contra.

POWELL, J. In 1877 a local act was passed making it penal to sell "spirituous or intoxicating liquors, schnapps, or bitters," within three miles of the Masonic Academy in the town of Swainsboro, Emanuel county (Acts 1877, p. 189). The defendant was convicted under an accusation charging that he "did sell in Swainsboro, Georgia, within and in less than one mile of the Masonic Academy, for valuable consideration, a certain quantity of intoxicating liquor, commonly known as Rutona." Upon the trial the State proved, by several witnesses, that they had bought Rutona of the defendant at his drug-store in Swainsboro; that they had drunk it, and that its effects were similar to those of whisky; that it was intoxicating. It is described as tasting like whisky with something bitter in it. One witness says: "I do not know what Rutona is made of. I don't know a single ingredient in it, but there must be some alcohol in it, from the effects it has. I never drank much of it, but on one or two occasions, when I had drunk too much whiskey, and whiskey was out, and I was feeling sick, I drank this. After a man has been on a drunk and he is nervous, he will drink most anything that is intoxicating, if he can't get whiskey. I drank this Rutona, and I know it will get up steam in a little while; it will quiet the nerves and put the blood to circulating, and make you feel good

again." The defendant introduced, among other witnesses, the president and the secretary of the Columbia Drug Company, the corporation by which Rutona is manufactured. The president testified, that he was a chemist by profession, and that the percentage of alcohol in Rutona is 22 per cent. in maceration, but that by the time it is through evaporating there is not over 18 to 20 per cent. left; formerly the percentage of alcohol was higher, but, by experiment, the amount had been reduced, and the above was the minimum amount which would preserve the alkaloids and keep the active ingredients in solution; that quinine is the active principle of Rutona; that it is a medicine, is not manufactured or sold as a beverage, is not an intoxicating liquor; that if a person were to take enough of the medicine to be affected by the alcohol, "he would be in a bad fix, he would not have any head left." The secretary of the Columbia Drug Company also testified, that the percentage of alcohol in Rutona was 22 per cent.; the medicine is obtained by allowing the alcohol to percolate through Peruvian cinchona bark and other crude drugs; only so much alcohol is used as is absolutely necessary to hold the drugs in solution; it is intensely bitter, does not contain one fourth as much alcohol as cheap whisky, is incapable of being used as a beverage; if a man were to drink enough of it to cause him to be affected by the alcohol, he would be positively stupefied; it contains less alcohol than a great many of the household remedies now on the market. Another witness testified, for the defendant, that he had bought a bottle of Rutona and had used it according to directions, and that it did him good; but this witness evinced his impartiality by testifying on cross-examination: "Good old rye whisky will do me good too, any tonic will do me good, and I expect it (referring to Rutona) would make you drunk." The defendant stated that he had sold Rutona along with other patent medicines in his store, not as a beverage, and with no intention of violating the law. Two bottles of the Rutona were introduced in evidence and submitted to the consideration of the jury, but as none of this was transmitted to this court with the record, we are unable to give any more accurate description of it than we have been able to summarize from the evidence, as above. The building known as the Masonic Academy in Swainsboro is no longer used for school purposes, though the Masonic lodge is still located there; the school has been moved to a new building just

a short distance away. The drug-store of the defendant, where the sales took place, was within a few hundred yards of both the old and the new location of the school.

1. By demurrer the point was raised that the act of 1877 is no longer in effect; that it has been repealed by the charter of the City of Swainsboro, approved December 6, 1900. The 26th section of that charter (Acts 1900, p. 435) is as follows: "That the city council shall have complete control of the manufacturing, wholesaling, and retailing of spirituous or malt liquors or any intoxicants in the city; provided, the license for retailing such shall not be less than one thousand dollars per annum; to prohibit the storage or keeping of wine, beer, malt, alcoholic or intoxicating liquors of any kind for illegal purposes, or prohibit the same from being brought into said city, and to punish within the limits prescribed by this charter any person or persons violating the same." The repealing of statutes by implication is not favored. We construe this clause of the charter as giving the city authorities control of the retailing only of such liquors as may now or hereafter be lawfully sold in Swainsboro, if there are now, for any reason, or shall hereafter be, by the repeal of the statute of 1877 or otherwise, any liquors which may be lawfully sold there.

2. Another demurrer to the accusation makes the point that in the act of 1877, the language used in describing the Masonic Academy is "in the town of Swainsboro, in Emanuel county," while the accusation merely uses the words "in Swainsboro, Georgia." There is nothing in the point. *Sessions* v. *State,* 115 *Ga.* 18; *Mayor of Smithville* v. *Dispensary Commissioners,* 125 *Ga.* 559; *Murphy* v. *Waycross,* 90 *Ga.* 36.

3. The plaintiff in error contends that since the school formerly taught in the Masonic Academy has been moved into another house near by, the act of 1877 is no longer of force. It is unnecessary for us to decide whether the act in question could be repealed even by the destruction of the building named therein and the total discontinuance of both the Masonic lodge and the school located therein at the time of the passage of the act, or whether the center of the three-mile territory to be affected has shifted by the removal of the school; since the acts for which the defendant was tried occurred within three miles of both the new and the old location of the school. We can not hold that the slight difference in the pres-

ent, from the former location of the school, operated to repeal the statute. Compare *Allen* v. *Lytle,* 114 *Ga.* 275.

4. The holding in the 4th headnote seems obvious.

5. The definition of intoxicating liquors, contained in the fifth headnote, rests upon the authority of Black on Intoxicating Liquors, §§2 and 3; Intoxicating Liquor cases, 25 Kan. 751 (37 Am. R. 284) ; *Colwell* v. *State,* 112 *Ga.* 75.

6. We think that the verdict would have been authorized, although not absolutely demanded, not only by the State's testimony, but also by the evidence submitted by the defendant himself. Under the testimony of the manufacturers, Rutona contains 18 to 22 per cent. alcohol. Although one of the witnesses states that there is not one fourth as much alcohol in this preparation as there is in cheap whisky, common knowledge contradicts him. Proof-spirit, or as it is commonly called hundred-proof liquor, the United States government's basis for revenue tax, is defined by the Standard Dictionary to be "an alcoholic liquor that contains half its volume of alcohol." Very little whisky is hundred-proof; most of it, especially the cheaper grades, runs from seventy, and even lower, to ninety-proof; that is to say, contains thirty-five to forty-five per cent. alcohol. Commercial alcohol itself is only 188 proof. Beers and wines usually contain only four to ten per cent. of alcohol. So that a preparation containing 22 per cent. of alcohol would be intoxicating even if taken in reasonably small quantities. The mere fact that a mixture may have medicinal virtues does not take it from under the ban of the law against the sale of intoxicants. Whisky itself is a stimulant, and has some good qualities as a medicine. The theory of prohibitory statutes is that it is better to forego the legitimate uses of these alcoholic mixtures than to risk the dangers of their abuses. However, in an alcoholic preparation, the alcohol may be so denatured as to render the mixture totally incapable of being used as a beverage; and such preparations are not within the purview of laws against the sale of intoxicating liquors. There was evidence from which the jury might have found that the preparation in question belongs to this class; and upon this contention the defendant mainly rested his defense. The trial court ignored this question and in effect charged to the contrary. The defendant was entitled to have this defense submitted for

whatever it was worth, in the light of all the testimony.   For this alone we grant a new trial.                    -  *Judgment reversed.*